WILLIAM G. WALKER, P.C.
1316 E. Broadway Blvd.
Tucson, AZ 85719
William G. Walker SBN 005361
wgwpc@aol.com
assistant@wgwatty.com
Telephone:  (520) 622-3330
*Attorney for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Michael Grabowski, A single man,**<br><br>        **Plaintiff,**<br><br>**Vs.**<br><br>**Arizona Board of Regents; Univversity of Arizona, Frederick Lee Harvey and wife Janet Harvey; Hannah Vivian Peterson, a single woman; James L. Li and wife, Jean Wang; James L. Frances and wife, Tammy Frances; Kim Hanson Barnes and husband, Andrew Barnes; David Wood Heeke and wife, Elizabeth Pangborn Heeke, and Benjamin James Crawford, a single man; Carlos Villarreal; and Hunter Davila, students.**<br><br>        **Defendants.** | **No.**<br><br>**COMPLAINT**<br>**Federal Discrimination/ Retaliation; Supplemental State Claims for Assault; Intentional Infliction of Emotional Distress; Punitive Damages; Defamation**<br><br>**(Jury Trial Requested)**<br><br>**Assigned to** |

Plaintiff, for his Complaint against Defendants, alleges as follows:

## Parties

1.      **Plaintiff Michael Grabowski**, a single man, is, and has been, since August 14, 2017, a student at the University of Arizona, Tucson, Arizona.

1

2. **Defendant Arizona Board of Regents** is, and was at all times relevant hereto, the administrative and funding body for the State of Arizona, the University of Arizona, and University of Arizona Athletics.

3. **Defendant Frederick Lee Harvey**, is, and was at all times relevant hereto, the Director of Cross-Country/Track and Field in the athletic department at the University of Arizona. On information and belief, Plaintiff alleges that all income derived during his tenure at the University of Arizona was utilized for the benefit of the community with his wife, **Janet Harvey**.

4. **Defendant James L. Li,** Associate Head Coach of Cross-Country/Distance is and was at all times relevant hereto, the Associate Head Coach of Cross-Country/Distance at the University of Arizona. It is alleged, on information and belief, that acts of his further alleged herein were for the benefit of the community with his wife, **Jean Wang**.

5. **Defendant Hannah Vivian Peterson** is, and was at all times relevant hereto, an Assistant Coach of Cross-Country/Distance at the University of Arizona at all times relevant hereto. In the event she is married, it is alleged, on information and belief, that acts of hers further alleged herein were for the benefit of the community with her husband, **Andrew Barnes**.

6. **Defendant James L. Frances** is and was at all times relevant hereto, the Senior Associate Director of Athletics/Track and Field at the University of Arizona. All acts alleged herein by him were for the benefit of the community with his wife, **Tammy Frances**.

2

7.     **Defendant Kim Hanson Barnes** is, and was at all times relevant hereto, the Executive Senior Associate Director of Athletics at the University of Arizona. All acts alleged herein were for the benefit of the community with her husband **Andrew Barnes**.

8.     **Defendant David Wood Heeke** is and was at all times relevant hereto the Director of Athletics at the University of Arizona. All acts alleged herein by **Defendant Heeke** was for the benefit of the community with his wife **Elizabeth Pangborn Heeke** and were within the scope and course of his employment with the University of Arizona.

9.     **Defendant Benjamin James Crawford** is, and was at all times relevant hereto, the Associate Athletics Trainer at the University of Arizona.

10.    **Defendant Carlos Villarreal** is, and was at all times relevant hereto, a student at the University of Arizona and a member of the University of Arizona Cross-Country/Track and Field Team.

11.    **Defendant Hunter Davila** is, and was at all times relevant hereto, a student at the University of Arizona and a member of the University of Arizona Cross-Country/Track and Field Team.

12.    Each Defendant named herein acted within the scope of his/her activities for the University of Arizona Athletics Department, the University of Arizona or the State of Arizona.

## Jurisdiction And Venue

13.    This Court has original jurisdiction in this action pursuant to 28 U.S.C. § 1331..

3

14. This Court has supplemental jurisdiction of Counts II and III pursuant to 28 U.S.C. § 1364.

15. A Notice of Claim was mailed, pursuant to A.R.S. § 12-821.01, to the Arizona Board of Regents and each of its members on March 5, 2019. More than 180 days have passed without a response.

**General Factual Allegations**

16. Prior to attending the University of Arizona, **Plaintiff Grabowski** attended Smithtown High School in Smithtown, New York.

17. During that time, he was named as an All-American long-distance runner and was heavily recruited at a number of Division I colleges, including the University of Michigan, the University of Connecticut and the University of Arizona.

18. In February of 2017, he took a recruiting trip, sponsored by the University of Arizona.

19. During the recruiting trip, he was hosted by **Defendant Carlos Villareal**. He also met **Defendant Hunter Davila**.

20. During the recruiting trip, he was treated well by the University of Arizona.

21. **Defendant Coach Li** and his assistant Coach Tim Riley were both kind and enthusiastic about his joining the team.

22. **Defendant Coach Harvey** also urged Plaintiff to join the team.

23. In June of 2017, **Plaintiff** engaged in a championship tour as a high school senior and became friends with top runners around the country.

24. During the tour, he had a breakout performance in the National Championship for the Under 20 Men's KKK Steeple Chase. The U20's, **Plaintiff** placed approximately .2 of a second from being on the US Team headed to Lima, Peru for the Pan-American Games.

25. University of Arizona **Defendants Harvey** and **Li** and Assistant Coach Riley saw Plaintiff's performance at the U20's and congratulated Plaintiff Grabowski on his run.

26. In August 2017, **Plaintiff Grabowski** arrived at the University of Arizona and moved into the dorms. At that time, he was on an educational scholarship and an athletic scholarship as a distance runner.

27. **Plaintiff Grabowski's** roommate, upon arriving at the U of A, was Vincent Huynh-Watkins who left the U of A mid-semester and moved back home to Oregon due to clinical depression.

28. By the end of **Plaintiff's** freshman year, he was the only one of four (4) distance recruits that year who would be retuning to the University of Arizona for his sophomore year.

29. Henry Weisberg, another freshman recruit of the same year, told **Plaintiff** that he had been falsely accused of racism by **Defendant Coach Harvey**. Weisberg told **Defendant Harvey** during his exit interview that there was bullying on the team. He returned home to Reno, Nevada where, upon information and belief, he now attends the University of Nevada at Reno.

30. On August 16 – 22, 2017, **Plaintiff** attended a pre-season cross-country camp at Forest Lakes, Arizona.

5

31. Starting at the camp, **Plaintiff Grabowski** began receiving bullying, which occurred almost daily whenever he encountered Hunter Davila. He also experienced regular bullying from **Defendant Carlos Villareal** when Defendant **Villareal** was in **Defendant Hunter Davila's** company.

32. Repeatedly, and again throughout his first year at the University of Arizona, **Defendants Davila** and Villarreal claimed to **Plaintiff** that he should have gone somewhere other than Arizona.

33. At the camp, everyone had a bed except for **Plaintiff.** During the camp, **Plaintiff** was treated poorly and bullied by other members of the team.

34. **Plaintiff** was treated miserably at camp.

35. **Plaintiff's** grades at school and his relationships with other students that were not in the running program was always exemplary.

36. In 2017, **Plaintiff** was awarded the Butch Dellacave Award for excellence in athletics and community service for his involvement in a combination of athletic and community service. Prior to receiving the award, he had volunteered for helping the elderly in addition to his athletic successes.

37. On August 28, 2017, Philip Grabowski, Plaintiff's father, called **Defendant Coach Li**. When **Li** returned the call, Plaintiff's dad talked directly about an ongoing knee injury which **Plaintiff** sustained at the camp.

38. Plaintiff's father also directly reported to **Defendant Li** the bullying to which **Plaintiff** had been subjected since the pre-season camp.

6

39. **Defendant Li** reported that **Plaintiff Grabowski** didn't "know the culture yet" so he couldn't judge the team. **Li** promised that he would look into the bullying and promised to talk to **Plaintiff** about the bullying separately.

40. **Plaintiff** and **Defendant Li** talked about the bullying some time within the next week.

41. On October 4, 2017, Plaintiff's mother, Mary Ann Stephens, emailed the team sports psychologist, Dr. Amy Athey, giving her permission to speak to **Plaintiff** since he was still a minor. Plaintiff's mother requested that Athey speak to **Plaintiff** about his difficulties.

42. Given the statements of **Defendant Li** to Plaintiff's father that he would be "right on top" of the bullying issue, Plaintiff's mother told **Plaintiff** that **Defendant Li** had assured **Plaintiff t**hat he was simply "adjusting".

43. In the last week of October, 2017, **Plaintiff** was repeatedly bullied by numerous members of the University of Arizona Athletic Department.

44. In late October, 2017, **Defendant Hunter Davila** posted a harassing, homophobic, obscene video about **Plaintiff** at the team's public chat group. The videotape, published by **Defendant Davila** was made at a University of Arizona party, attended by many people who were unknown to **Plaintiff**.

45. Although **Plaintiff** did not attend the party, he heard about the video and the accusations concerning him.

46. On October 31, 2017, **Defendant Fred Harvey** hosted a Halloween party, but did not raise any issues concerning the publication of the video or the constant bullying

7

suffered by the **Plaintiff.** During the party, **Defendant Harvey** did not respond whatsoever to the complaints made by **Plaintiff** at the party.

47. On November 9, 2017, **Plaintiff** turned 18.

48. In January, 2018, after having met with Dr. Athey's and reporting aggressive bullying, almost daily, **Plaintiff** met several times with Dr. Athey's associate, Michelle Johnson-Skog. Again, he reported aggressive bullying, almost daily.

49. Every time **Plaintiff Grabowski** mentioned the "bullying" to either one of the coaches, they rephrased it as Plaintiff's need to "adjust" and, on information and belief, they did nothing to address or report the bullying in clear violation of the University of Arizona's Non-Discrimination and Anti-Harassment Policy which obligated each of the coaches to report the bullying, yet they did nothing.

50. On January 19, 2018, Plaintiff's father called **Defendant Li** and left a voicemail.

51. On January 24, 2018, **Defendant Li** returned the telephone call during which Plaintiff's father reported that little has changed since the first phone conversation with **Defendant Li**.

52. On January 24, 2018, **Defendant Li** promised to speak to **Plaintiff** about the bullying.

53. On the same day, Plaintiff's mother sent her second email to Dr. Amy Athey, expressing serious concern about **Plaintiff's** increasing sadness and asking her to speak to **Plaintiff** as soon as possible.

54. Although his mother did not speak personally about the bullying, she did discuss the bullying at length with Athey and Skog in both October of 2017 and January, 2018.

55. During those calls, Athey and Skog refused to describe the activity with **Plaintiff Grabowski** as "bullying". They simply stated that they blamed **Plaintiff Grabowski** and told him repeatedly of his need to "adjust".

56. On the evening of September 12, 2018, after a team dinner, **Defendant Harvey**, long-distance running coach **Defendant Li**, assistant coach **Defendant Hannah Peterson** and **Defendant Crawford** brought **Plaintiff** to **Coach Li's** office at McKale Stadium.

57. In the face of new initiatives in athletics against harassment, and acting as if he had no advance reports of the bullying, **Defendants Harvey** and **Li** denied that they knew anything about the bullying received by the **Plaintiff**.

58. On August 24th, shortly after the pre-season camp, **Plaintiff** met with **Defendant Li** and the new assistant coach, **Defendant Hannah Peterson**.

59. At that meeting**, Defendant Li** asked him, as if he had no advance reporting of it, if there had been any bullying "going on".

60. **Plaintiff**, at that time, specifically named **Defendants Carlos Villarreal** and **Hunter Davila**. Plaintiff reported that other teammates had been bullied by them too. **Defendant Li** replied, "you can't single out the two top runners on the team".

61.     On September 1, after **Plaintiff** vomited twice during the team's meeting at Flagstaff and ended the race with a very disappointing time, **Plaintiff** reported his fever and nausea, which continued after they returned to Tucson.

62.     At practice, **Defendant Peterson** angrily scolded **Plaintiff** for "faking" an illness.

63.     When **Plaintiff** voluntarily saw a doctor at McKale, he was sent for blood tests and diagnosed with viral illness.

64.     Since being told on August 24, 2018 by **Defendant Li** that he could not "single out" his bullies, **Plaintiff** noted a concerted effort among the coaches to demoralize him.

65.     On the evening of September 12, 2018, **Plaintiff** was brought into **Defendant Li's** office at McKale for a "meeting" with **Defendants Li, Peterson**, **Harvey** and **Crawford**.

66.     While in the meeting, the **Defendant coaches** locked the door so that no one could come in or hear the discussion.

67.     **Defendant Li** then took **Plaintiff's** possessions away from him and placed them behind **Li's** desk, far out of his reach.

68.     **Defendant Harvey** then sternly stated, "there's a certain atmosphere we are trying to establish on this team, and you do not fit in it". He dismissed **Plaintiff** from the program, furiously and repeatedly saying that **Plaintiff's** name "kept coming up" associated with "a string of things" and refused to give **Plaintiff** any specific details.

69. To the date of the filing of this Complaint, despite repeated requests, **Plaintiff** has never received any written notice in any form from anyone at the University of Arizona indicating that he had ever done anything wrong.

70. At the meeting, **Plaintiff** told **Defendant Harvey** that he had never done anything wrong, had never violated any team rules, and asked him specifically for details. **Defendant Harvey** gave no details, only insults. When **Plaintiff** brought up the bullying, **Defendant Harvey** lept out of his chair, ran up to within a few inches of **Plaintiff's** face, slammed his hands down hard on **Plaintiff's** arms, pressing them painfully into the metal arms of the chair as he leaned in with spit hitting **Plaintiff's** face and called **Plaintiff** a "fucking racist", a "white racist", a "fucking white racist", a "fucking liar", and more.

71. **Plaintiff** was terrified. His heart was pounding, his blood pressure shot up and he had a spontaneous bloody nose and fainted.

72. **Plaintiff** woke up on the floor. As soon as he could get back into the chair, **Defendant Harvey** continued insisting that **Plaintiff** was lying, that there could never be any bullying on his team, that he was a "person of low character" for even suggesting that bullying could ever exist on his team, and for a long string of things, none of which he could describe, other than **Plaintiff's** opposition to being bullied.

73. On September 14, believing that the removal had been a misunderstanding and would be sorted out, **Plaintiff** went to cheer on his roommates at a meet in Reid Park.

74. As he neared the team tent, **Defendant Li** told him that **Defendant Peterson** had complained to associate athletic director **Defendant James Frances** that **Plaintiff** was

at the park and, although it was a public park, **Defendant Frances** ordered that **Plaintiff** could not speak with any of his many teammates who ran out to greet **Plaintiff**.

75. At the meet, Plaintiff's parents joined him and had a lengthy discussion with **Defendant Frances**. **Frances** repeated **Defendant Harvey's** mantra, that **Plaintiff's** "name" kept coming up because he was being accused by athletics of a "string of things". The details given by **Defendant** Frances were:

(1) **Defendant Harvey** claimed **Plaintiff** had sexually harassed a female student who later transferred out of the University of Arizona. **Defendant Frances** insisted there were outstanding University of Arizona and Title IX Complaints filed against **Plaintiff** for this incident.

At the beginning of the 2018 semester, **Defendant Li** told **Plaintiff** directly that the female student never filed any complaint, that **Plaintiff's** name was not involved in the allegations and that he should forget about the entire incident, for it never concerned **Plaintiff**.

Other university officials confirmed **Defendant Li's** reporting.

(2) Allegedly, **Defendant Harvey** insisted that **Plaintiff** was involved in a racial incident for which **Defendant Harvey** alleged **Plaintiff** and another recruit were called together for a meeting in **Defendant Harvey's** office.

This accusation was a complete lie, and **Defendant Harvey's** allegation was entirely fabricated. **Plaintiff** was never involved in this or any other racial incident.

12

(3)     **Defendant Coaches Harvey** and **Li** insisted that **Plaintiff** was overheard "joking" about rape with teammates and therefore had an official Title IX Complaint lodged against him.

On September 10th, while **Plaintiff** was at practice, he softly spelled "R-A-P-E" in response to a teammate while having a conversation about the importance of a woman's right to say no to sex.

**Plaintiff's** response to said allegation is, "I have always been a strong women's rights advocate and any comment I made was in support of a woman's right to say no regardless of the circumstance."

76.     According to **Defendant Coaches Harvey** and **Li,** teammates of the **Plaintiff** filed a Title IX complaint alleging that he been "joking" about rape. "The coaches claimed that that was cause to remove me from the program."

77.     Plaintiff states "The Dean of Students has repeatedly told me that no complaint was ever filed against me, there are no substantiated complaints of any type against me and I have never been found to have violated Title IX."

78.     On September 27, 2018, **Plaintiff** and his parents met with **Defendant Coaches Harvey** and **Li,** Associate Director of Athletics, **Defendant Frances** and **Defendant Kim Hanson Barnes** in **Defendant Harvey's** office.

79.     **Defendant Frances** told **Plaintiff** and his parents, and **Defendant Harvey** confirmed, that the purpose of this meeting was solely for **Plaintiff** and his parents to ask questions about the reasons **Plaintiff's** removal. They stated that **Plaintiff's** place on the

team was a privilege; that the coaches could, and did, instantly rescind at their complete discretion and that there would no opportunity for reconsideration or appeal of the removal.

80. At the meeting, the persons there reviewed **Defendant Harvey's** "string of things" and his responses.

81. **Plaintiff** and his parents mentioned that the Title IX and University offices had no complaints against **Plaintiff**.

82. Both **Defendant Coaches** insisted that the complaints existed within athletics.

83. **Defendant Barnes** asked the coaches if they had ever filed anything in writing within athletics about the allegations and much to her dismay, they both stated "no".

84. At the meeting, the focus became the "rape" conversation. Both **Defendant coaches** insisted, at the meeting, that **Plaintiff's** comments in that regard were "inappropriate joking", insisting that voicing support for a feminist cause with the word "rape" in its name and having the audacity to spell the word "rape" was disruptive to the team and reason for dismissal.

85. This, from a team with rampant depravity, abundant rule-breaking and regular serious harassment, was clearly made up.

86. At the time of the meeting, **Defendant Davila**, the most active and malicious bully had a "Do Not Contact Order" in place against him for his sexual harassment of a female teammate.

87. At this meeting, **Defendant Harvey** lied, vehemently denying that he ever heard about the bullying from anyone.

88. From 2015 – 2018 only 12.5% of recruited runners have even a chance to finish all four years of running on the team. One was **Defendant Carlos Villarreal** and the other is Connor McCabe who is currently a sophomore.

89. No runners from the 2016-2017 recruiting classes finished more than 1.5 semesters on the team.

90. The 2016 recruiting class was composed of six runners and the 2017 recruiting class was four runners for a total of 10 runners.

91. 87.5% of recruited runners did not finish four years on the cross-country team.

92. 75% of the recruited runners (2015-2018) were gone by 1.5 semesters.

93. 68.75% of recruited runners (2015 – 2018) were gone by year one.

94. The average retention rate for a Division I NCAA team recruiting class is 80% which is four times better than U of A Cross-Country's retention rate.

95. A program that loses almost every athlete most certainly has problems.

96. The running program at the University of Arizona is racist, sexist, and designed such that the program is not susceptible to favoring or helping the students who enter. Rather, the coaching staff, and ancillary persons at the University of Arizona are designed to protect the coaches and favor certain runners over others.

## COUNT I
### (Violations of Title IX and 28 U.S.C. § 1983)

97. Paragraphs 1 – 96 are incorporated by reference.

98. Defendants Arizona Board of Supervisors and University of Arizona receive and expend fees from the federal government and are subject to the requirements of 28 U.S.C. Title IX.

99. The actions, statements and facts cited above show a pattern of racial, sexual and other discrimination against **Plaintiff** by **Defendants** aforementioned.

## COUNT II
### (Assault)

100. Paragraphs 1 – 99 are incorporated by reference.

101. The actions of **Defendant Fred Harvey** were done recklessly or deliberately by **Defendant Coach Fred Harvey** and constitute assault.

102. **Plaintiff Grabowski** was physically and emotionally damaged by the assault and had to be taken to the hospital.

## COUNT III
### (Defamation)

103. Paragraphs 1 – 101 are incorporated by reference.

104. The statements of all **Defendants** aforementioned constitute defamation of **Plaintiff Michael Grabowski**.

105. The statements were made public and delivered to others in a deliberate attempt to sully the reputation of the **Plaintiff** and to cause disrepute.

106. The statements aforementioned were untrue and designed to cause **Plaintiff** emotional and physical damages. The above constitute defamation *per se*.

### COUNT IV
### (Punitive Damages)

107. Paragraphs 1 – 105 are incorporated by reference.

108. The acts of **Defendants** recited herein were done maliciously and within intent to falsely harm Plaintiff Grabowski.

109. Plaintiff was damages by all acts alleged herein, both physically and emotionally.

**Wherefore**, Plaintiff prays for the following relief:

- Compensatory damages against each **Defendant** for the acts alleged herein in an amount of $3,000,000.00;

- Attorney's fees, taxable costs;

- Punitive damages for the malicious conduct of each **Defendant** in both the Federal and State court causes of action (Counts I – III)

### **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (I) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual

contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

DATED this 16th day of September, 2019.

                                WILLIAM G. WALKER, P.C.

                                By: /s/ William G. Walker
                                    Attorney for Plaintiffs