WILLIAM G. WALKER, P.C.
1316 E. Broadway Blvd.
Tucson, AZ 85719
William G. Walker SBN 005361
Bill@wgwatty.com
assistant@wgwatty.com
Telephone: (520) 622-3330
*Attorney for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Grabowski, A single man,<br><br>    Plaintiff,<br><br>Vs.<br><br>Arizona Board of Regents; and University of Arizona,<br><br>    Defendants. | No. 4:19-cv-00460-SHR<br><br>**PLAINTIFF'S FOURTH AMENDED COMPLAINT**<br>Federal Discrimination/ Retaliation;<br><br>(Jury Trial Requested)<br><br>Assigned to Scott H. Rash |

Plaintiff, for his Fourth Amended Complaint against Defendants, alleges as follows:

### Parties

1. **Plaintiff Michael Grabowski**, a single man, was a student at the University of Arizona since August 14, 2017 and at all times relevant hereto.

2. **Defendant Arizona Board of Regents** is, and was at all times relevant hereto, the administrative and funding body for the State of Arizona, the University of Arizona, and University of Arizona Athletics.

1

3. **Frederick Lee Harvey**, is, and was at all times relevant hereto, the Director of Cross-Country/Track and Field in the athletic department at the University of Arizona.

4. **James Li** is and was at all times relevant hereto, the Associate Head Coach for the Cross-Country/Track and Field team in the athletic department at the University of Arizona.

5. All acts committed by Frederick Lee Harvey and James Li, named herein acted within the scope of his/her activities for the University of Arizona Athletics Department, the **University of Arizona,** or the State of Arizona.

## Jurisdiction And Venue

6. This Court has original jurisdiction in this action pursuant to 28 U.S.C. § 1331.

## General Factual Allegations

7. Prior to attending the University of Arizona, **Plaintiff Grabowski** attended Smithtown High School in Smithtown, New York.

8. During that time, he was named as an All-American long-distance runner and was heavily recruited at a number of Division I colleges, including the University of Michigan, the University of Connecticut and the University of Arizona.

9. In February of 2017, he took a recruiting trip, sponsored by the University of Arizona.

10. During the recruiting trip, he was hosted by members of the University of Arizona Cross-Country/Track & Field Team.

11. During the recruiting trip, he was treated well by the University of Arizona.

2

12. **Coach Li** and his assistant Coach Tim Riley were both kind and enthusiastic about his joining the team.

13. **Coach Harvey** also urged Plaintiff to join the team.

14. In June of 2017, **Plaintiff** engaged in a championship tour as a high school senior and became friends with top runners around the country.

15. During the tour, he had a breakout performance in the National Championship for the Under 20 Men's 3K Steeple Chase. At the U20's, **Plaintiff** placed approximately .2 of a second from being on the US Team headed to Lima, Peru for the Pan-American Games.

16. University of Arizona **Coaches Harvey** and **Li** and Assistant Coach Riley saw Plaintiff's performance at the U20's and congratulated **Plaintiff Grabowski** on his run.

17. In August 2017, **Plaintiff Grabowski** arrived at the University of Arizona and moved into the dorms. At that time, he was on an educational scholarship and an athletic scholarship as a distance runner.

18. **Plaintiff Grabowski's** roommate, upon arriving at the U of A, was Vincent Huynh-Watkins who left the U of A mid-semester and moved back home to Oregon due to clinical depression.

19. By the end of **Plaintiff's** freshman year, he was the only one of four (4) distance recruits that year who would be returning to the University of Arizona for his sophomore year.

3

20. Henry Weisberg, another freshman recruit of the same year, told **Plaintiff** that he had been falsely accused of racism by **Coach Harvey**. Weisberg told **Harvey** during his exit interview that there was bullying on the team. He returned home to Reno, Nevada where, upon information and belief, he now attends the University of Nevada at Reno.

21. On August 16 – 22, 2017, **Plaintiff** attended a pre-season cross-country camp at Forest Lakes, Arizona.

22. Starting at the camp, **Plaintiff Grabowski** began receiving sexual and homophobic bullying, by team members which occurred almost daily. He also experienced regular sexual bullying from team member Carlos Villareal when Villareal was in the company of Hunter Davila.

23. Teammates regularly, and almost daily, claimed that Plaintiff should have gone somewhere other than Arizona; that he was "gay"; that he was a "fag"; and made multiple additional references alleging that they perceived him as gay.

24. Repeatedly, and again throughout his first year at the University of Arizona, Davila and Villarreal claimed to **Plaintiff** that he should have gone somewhere other than Arizona.

25. At the camp, everyone had a bed except for **Plaintiff.** During the camp, **Plaintiff** was treated poorly, and other members of the team began accusing the Plaintiff of being gay, alleging to him and others that he was homosexual, gay, a fag.

4

26. Plaintiff's relationships with other students that were not in the running program was always exemplary. His access to educational opportunities and benefits, however, were effectively barred as follows:

(a) He was excluded from group meetings and projects in educational classes that he attended with other student athletes on a regular basis;

(b) He was denied an $8000.00 grant/scholarship because his grades slipped below the minimum once the effects of the harassment and retaliation were known to Michael.

(c) He was denied access to special tutoring, available only to student athletes on scholarship;

(d) Because of the hostile environment at the University of Arizona, caused by the harassment by student athletes, lack of response by the institutional defendants and the retaliation and further harassment by being excluded from the team, he was denied his scholarship and other benefits. As a result of the loss of his scholarship, he was forced to transfer to another college and to retake numerous classes.

In 2017, **Plaintiff** was awarded the Butch Dellacave Award for excellence in athletics and community service for his involvement in a combination of athletic and community service. Prior to receiving the award, he had volunteered to help the elderly in addition to his athletic successes.

27. On August 28, 2017, Philip Grabowski, Plaintiff's father, called **Coach Li.** When **Li** returned the call, Plaintiff's dad talked directly about an ongoing knee injury which **Plaintiff** sustained at the camp.

5

28. Plaintiff's father also directly reported to **Li** the bullying to which **Plaintiff** had been subjected since the pre-season camp.

29. **Li** reported that **Plaintiff Grabowski** didn't "know the culture yet" so he couldn't judge the team. **Li** promised that he would look into the instances of sexual bullying and promised to talk to **Plaintiff** about the sexual bullying separately.

30. **Plaintiff** and **Li** talked about the sexual bullying sometime within the next week.

31. On October 4, 2017, Plaintiff's mother, Mary Ann Stephens, emailed the team sports psychologist, Dr. Amy Athey, giving her permission to speak to **Plaintiff** since he was still a minor. Plaintiff's mother requested that Athey speak to **Plaintiff** about the persistent sexual bullying.

32. By this time, as stated in previous paragraphs, the **Defendant University of Arizona**, and particularly **Coaches Li** and **Harvey** had personal knowledge of the nature and extent of the sexual bullying **Plaintiff** received from Hunter Davila and Carlos Villarreal and many others on University of Arizona Cross-Country/Track and Field Team.

33. Given the statements of **Coach Li** to Plaintiff's father that he would be "right on top" of the sexual and homophobic bullying issue, Plaintiff's mother told **Plaintiff** that **Li** had promised that **Plaintiff** was simply "adjusting" and that he would be "right on top" of the sexual bullying issue.

34. In the last week of October, 2017, the sexual and homophobic bullying of the **Plaintiff** was repeated by numerous members of the University of Arizona Athletic Department.

6

35. In late October, 2017, students on the team posted on the internet a harassing, homophobic, obscene video about **Plaintiff** at the team's public chat group. The videotape was made at a University of Arizona party, attended by many people who were unknown to **Plaintiff**. Subsequently, the video was published to the internet again.

36. The allegations in the video were untrue.

37. The videotape remains published to this day for all who have computer access to view.

38. Although **Plaintiff** did not attend the party, he heard about and viewed the video and the sexual, homophobic and untrue allegations against him.

39. On October 31, 2017, **Fred Harvey** hosted a Halloween party but did not raise any issues concerning the publication of the video or the constant homophobic and sexual bullying suffered by the **Plaintiff.** During the party, **Harvey** did not respond whatsoever to the complaints made by **Plaintiff** at the party.

40. On November 9, 2017, **Plaintiff** turned 18.

41. In January, 2018, after having met with Dr. Athey and reporting aggressive bullying, almost daily, **Plaintiff** met several times with Dr. Athey's associate, Michelle Johnson-Skog. Again, he reported aggressive sexual and homophobic bullying, almost daily.

42. Every time **Plaintiff Grabowski** mentioned the "sexual and homophobic bullying" to either one of the **coaches,** they rephrased it as Plaintiff's need to "adjust" and, on information and belief, they did nothing to address or report the sexual or homophobic bullying in clear violation of the University of Arizona's Non-Discrimination and Anti-

7

Harassment Policy which obligated each of the **coaches** to report the bullying, yet they did nothing.

43. On January 19, 2018, Plaintiff's father called **Coach Li** and left a voicemail.

44. On January 24, 2018, **Li** returned the telephone call during which Plaintiff's father reported that little had changed since the first phone conversation with **Li.**

45. On January 24, 2018, **Li** promised to speak to **Plaintiff** about the sexual, homophobic bullying.

46. On the same day, Plaintiff's mother sent her second email to Dr. Amy Athey, expressing serious concern about **Plaintiff's** increasing sadness and asking her to speak to **Plaintiff** as soon as possible.

47. Although his mother did not speak personally about the sexual and homophobic bullying, she did discuss the sexual and homophobic bullying at length with Athey and Skog in both October of 2017 and January, 2018.

48. During those calls, Athey and Skog refused to describe the activity with **Plaintiff Grabowski** as "sexual and homophobic bullying". They simply stated that they blamed **Plaintiff Grabowski** and told him repeatedly of his need to "adjust".

49. On August 24th, 2018, shortly after the pre-season camp, **Plaintiff** met with **Li** and the new assistant coach, Hannah Peterson.

50. At that meeting**, Coach Li** asked him, as if he had no advance reporting of it, if there had been any bullying "going on".

51. **Plaintiff**, at that time, specifically named student athletes as members of the team that had sexually and homophobically bullied him. **Plaintiff** reported that other

8

teammates had been bullied by them too. **Coach Li** replied: "you can't single out the two top runners on the team".

52. Since being told on August 24, 2018 by **Li** that he could not "single out" his bullies, **Plaintiff** noted a concerted effort among the coaches to demoralize him.

53. On September 1, after **Plaintiff** vomited twice during the team's meeting at Flagstaff and ended the race with a very disappointing time, **Plaintiff** reported his fever and nausea, which continued after he returned to Tucson.

54. At practice, Assistant Coach Peterson angrily scolded **Plaintiff** for "faking" an illness.

55. When **Plaintiff** voluntarily saw a doctor at McKale, he was sent for blood tests and diagnosed with viral illness.

56. On the evening of September 12, 2018, after a team dinner, **Harvey** and long-distance running coach **Li**, assistant coach Hannah Peterson and Benjamin Crawford brought **Plaintiff** to **Coach Li's** office at McKale Stadium.

57. In the face of new initiatives in athletics against harassment and acting as if he had no advance reports of the bullying, **Harvey** and **Coach Li** denied that they knew anything about the sexual, homophobic bullying received by the **Plaintiff**.

58. Coaches **Harvey** and **Li** directly lied about their knowledge of the sexual and homophobic bullying of Plaintiff.

59. As indicated above, **Coach Li** knew directly of the sexual and homophobic bullying by multiple members of the team, including Hunter Davila and Carlos Villarreal.

9

60. On the evening of September 12, 2018, **Plaintiff** was brought into Coach Li's office at McKale for a "meeting" with **Li**, Peterson, **Harvey,** and Crawford.

61. While in the meeting, the **coach** locked the door so that no one could come in or hear the discussion.

62. **Coach Li** then took **Plaintiff's** possessions away from him and placed them behind Li'**s** desk, far out of his reach.

63. **Coach Harvey** then sternly stated, "there's a certain atmosphere we are trying to establish on this team, and you do not fit in it". He dismissed **Plaintiff** from the program, furiously and repeatedly saying that **Plaintiff's** name "kept coming up" associated with "a string of things" and refused to give **Plaintiff** any specific details.

64. To the date of the filing of this Complaint, despite repeated requests, **Plaintiff** has never received any written notice in any form from anyone at the University of Arizona indicating that he had ever done anything wrong.

65. At the meeting, **Plaintiff** told **Harvey** that he had never done anything wrong, had never violated any team rules, and asked him specifically for details. **Harvey** gave no details, only insults. When **Plaintiff** brought up the sexual and homophobic bullying, **Harvey** lept out of his chair, ran up to within a few inches of **Plaintiff's** face, slammed his hands down hard on **Plaintiff's** arms, pressing them painfully into the metal arms of the chair as he leaned in with spit hitting **Plaintiff's** face and called **Plaintiff** a "fucking racist", a "white racist", a "fucking white racist", a "fucking liar", and more.

66. **Plaintiff** was terrified. His heart was pounding, his blood pressure shot up and he had a spontaneous bloody nose and fainted.

67. **Plaintiff** woke up on the floor. As soon as he could get back into the chair, **Harvey** continued insisting that **Plaintiff** was lying, that there could never be any sexual, homophobic bullying on his team, that he was a "person of low character" for even suggesting that bullying could ever exist on his team, and for a long string of things, none of which he could describe, other than **Plaintiff's** opposition to being sexually and homophobically bullied.

68. On September 14, believing that his removal from the team had been a misunderstanding and would be sorted out, **Plaintiff** went to cheer on his roommates at a meet in Reid Park.

69. As he neared the team tent, **Coach Li** told him that Peterson had complained to associate athletic director James Francis, that **Plaintiff** was at the park and, although it was a public park, Francis ordered that **Plaintiff** could not speak with any of his many teammates who ran out to greet **Plaintiff**.

70. At the meet, Plaintiff's parents joined him and had a lengthy discussion with Francis. Francis repeated **Harvey's** mantra, that **Plaintiff's** "name" kept coming up because he was being accused by athletes of a "string of things".

71. **Coach Harvey** claimed **Plaintiff** had sexually harassed a female student who later transferred out of the University of Arizona. Francis insisted there were outstanding University of Arizona and Title IX Complaints filed against **Plaintiff** for this incident.

72. At the beginning of the 2018 semester, **Li** told **Plaintiff** directly that the female student never filed any complaint, that **Plaintiff's** name was not involved in the

11

allegations and that he should forget about the entire incident, for it never concerned **Plaintiff**.

78. Other university officials confirmed **Li's** reporting.

79. **Coach Harvey**, on information and belief, insisted that Plaintiff was involved in a racial incident for which **Harvey** alleged **Plaintiff** and another recruit were called together for a meeting in **Harvey's** office. This accusation was a complete lie, and **Harvey's** allegation was entirely fabricated. **Plaintiff** was never involved in this or any other racial incident

80**.** **Coaches Harvey** and **Li** insisted that **Plaintiff** was overheard "joking" about rape with teammates and therefore had an official Title IX Complaint lodged against him.

81. On September 10th, while **Plaintiff** was at practice, he softly spelled "R-A-P-E" in response to a teammate while having a conversation about the importance of a woman's right to say no to sex.

82**.** **Plaintiff's** response to said allegation is, "I have always been a strong women's rights advocate and any comment I made was in support of a woman's right to say no regardless of the circumstance."

83. Francis claimed that he learned from **Harvey** that Plaintiff had sexually harassed a female student who later transferred out of the University of Arizona.

84. Francis insisted that there were outstanding University of Arizona and Title IX Complaints filed against Plaintiff.

85. These were lies, as at the beginning of the 2018 semester, **Coach Li** told **Plaintiff** directly that the female student never filed any complaint, and that Plaintiff's

12

name was not involved in the allegations and he should forget about the entire incident, for it never concerned Plaintiff.

86. Other university officials confirmed.

87. According to **Coaches Harvey** and **Li,** teammates of the **Plaintiff** filed a Title IX complaint alleging that he been "joking" about rape. "The coaches claimed that that there was cause to remove **Plaintiff** from the program."

88. The Dean of Students has repeatedly told **Plaintiff** that no complaint was ever filed against him, there are no substantiated complaints of any type against him and he has never been found to have violated Title IX.

89. On September 27, 2018, **Plaintiff** and his parents met with **Coaches Harvey** and **Li,** Associate Director of Athletics Francis and Erika Kim Hanson Barnes in **Harvey's** office.

90. James Francis told **Plaintiff** and his parents, and **Harvey** confirmed, that the purpose of this meeting was solely for **Plaintiff** and his parents to ask questions about the reasons for **Plaintiff's** removal. They stated that **Plaintiff's** place on the team was a privilege; that the coaches could, and did, instantly rescind at their complete discretion and that there would be no opportunity for reconsideration or appeal of the removal.

91. At the meeting, the persons there reviewed **Harvey's** "string of things" and his responses.

92. **Plaintiff** and his parents stated that the Title IX and University offices had no complaints against **Plaintiff**.

93. Both **Coaches** insisted that the complaints existed within athletics.

94. Ms. Barnes asked the coaches if they had ever filed anything in writing within athletics about the allegations and much to her dismay, they both stated "no".

95. At the meeting, the focus became the "rape" conversation. Both **coaches** insisted, at the meeting, that **Plaintiff's** comments in that regard were "inappropriate joking", insisting that voicing support for a feminist cause with the word "rape" in its name and having the audacity to spell the word "rape" was disruptive to the team and reason for dismissal.

96. This, from a team with rampant depravity, abundant rule-breaking and regular serious sexual and homophobic harassment, was clearly made up.

97. At the time of the meeting, team member Hunter Davil**a**, the most active and malicious bully had a "Do Not Contact Order" in place against him for his sexual harassment of a female teammate.

98. At this meeting**, Harvey** lied, vehemently denying that he ever heard about the sexual and homophobic bullying from anyone.

99. From 2015 – 2018, only 12.5% of recruited runners have even a chance to finish all four years of running on the team. One was Carlos Villarreal and the other is Connor McCabe who is currently a sophomore.

100. No runners from the 2016-2017 recruiting classes finished more than 1.5 semesters on the team.

101. The 2016 recruiting class was composed of six runners and the 2017 recruiting class was four runners for a total of 10 runners.

102. 87.5% of recruited runners did not finish four years on the cross-country team.

103. 75% of the recruited runners (2015-2018) were gone by 1.5 semesters.

104. 68.75% of recruited runners (2015 – 2018) were gone by year one.

105. The average retention rate for a Division I NCAA team recruiting class is 80% which is four times better than U of A Cross-Country's retention rate.

106. A program that loses almost every athlete most certainly has problems.

107. The running program at the University of Arizona is sexist and designed such that the program is not susceptible to favoring or helping the students who enter. Rather, the coaching staff, and ancillary persons at the University of Arizona are designed to protect the coaches and favor certain runners over others.

108. At all relevant times hereto, Plaintiff was discriminated against and his educational opportunities at the University of Arizona were significantly disrupted by the sexual and homophobic rants and subsequent discrimination by his teammates.

**COUNT I**
**(Violations of Title IX; Board of Regents, University of Arizona)**

109. Paragraphs 1 – 108 are incorporated by reference.

110. **Defendants Arizona Board of Regents** and **University of Arizona** receive and expend fees from the federal government and are subject to the requirements of 28 U.S.C. Title IX.

111. The actions, statements and facts cited above show a pattern of racial, sexual and other discrimination against **Plaintiff** by **Defendants** aforementioned.

15

112. instead of attempting to remedy the situation, dismissed **Plaintiff** from the team, cancelling his scholarship and preventing him from continuing to attend the **University of Arizona.**

113. As stated above, **Defendants Arizona Board of Regents** and **University of Arizona** had actual knowledge of (1) the bullying; (2) that harassers as alleged above were under the control of the **Arizona Board of Regents** and **University of Arizona**; (3) the harassment alleged above was based on the victim's perceived sexual orientation; (4) the harassment was so severe, pervasive and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit; and (5) the District was deliberately indifferent to the harassment.

114. **Defendants'** failure to investigate, acknowledge, and failure to attempt to rectify the sexual bullying of **Plaintiff** indicate a formal policy of indifference to the rights of **Plaintiff.**

115. The acts of **Harvey** and **Li,** in expelling **Plaintiff** from the program and cancelling his scholarship in discrimination against him for his reports of sexual bullying constitute the office policy of the **University of Arizona** in discriminating against the Plaintiff.

**Wherefore**, Plaintiff prays for the following relief:

- Compensatory damages against each **Defendant** for the acts alleged herein in an amount of $10,000,000.00

- Attorney's fees, taxable costs;

Respectfully submitted this 18th day of January, 2024.

16

WILLIAM G. WALKER, P.C.

/s/ William G. Walker  
Attorney for Plaintiff

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (I) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

DATED this 18th day of January, 2024.

WILLIAM G. WALKER, P.C.

By: /s/ William G. Walker  
Attorney for Plaintiffs

17

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of January, 2024, a copy of the foregoing was electronically transmitted t to the Clerk's Office using the CM/ECF system for filing and transmittal of Notice of Electronic filing to the following CM/ECF registrants.

Patricia V. Waterkotte, Esq.
Rusing, Lopez & Lizardi, P.L.L.C.
636 N. Swan Road, # 151
Tucson, AZ 85718
Attorneys for Defendants

By: /s/ *Lauren A. Bryant*